Filed 7/2/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| STATE BUILDING AND CONSTRUCTION TRADES COUNCIL OF CALIFORNIA, AFL-CIO, | ) ) ) ) | |
| Plaintiff and Appellant, | ) | S173586 |
| v. | ) ) | Ct.App. 4/1 D052181 |
| CITY OF VISTA et al., | ) ) | San Diego County Super. Ct. No. 37-2007- |
| Defendants and Respondents. | ) ) | 00054316-CU-WM-NC |

A charter city entered into certain contracts for the construction of public buildings. A federation of labor unions then petitioned the superior court for a peremptory writ of mandate, asserting that the city must comply with California's prevailing wage law notwithstanding local ordinances stating otherwise. The prevailing wage law requires that certain minimum wage levels be paid to contract workers constructing public works.

Under the state Constitution, the ordinances of charter cities supersede state law with respect to "municipal affairs" (Cal. Const., art. XI, § 5), but state law is supreme with respect to matters of "statewide concern" (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 17 (*California Fed. Savings*)). Here, petitioner contends that the subject matter of the state's prevailing wage law is a "statewide concern" over which the state has primary

1

legislative authority.  (*Ibid.*)  The city responds that the matter is a municipal affair and therefore governed by its local ordinances.  We agree with the city.

## I. FACTS

In 2006, the voters of the City of Vista in San Diego County approved a .5 percent sales tax to fund the construction and renovation of several public buildings.  The proposed projects involved the seismic retrofit of an existing fire station and the construction of two new fire stations, a new civic center, a new sports park, and a new stagehouse for the city's Moonlight Amphitheatre.  At that time, Vista was a general law city.[1]  In February 2007, the Vista City Attorney submitted a report to the city council recommending that Vista take steps to become a charter city.  The report asserted that the conversion would give the city the option of not paying prevailing wages on its planned public works projects, "result[ing] in millions of dollars of savings over the next few years and beyond."

The Vista City Council then authorized a special election for residents of the city to vote on a ballot measure that would change Vista from a general law city into a charter city.  In the voter information pamphlet, the "City Attorney Impartial Analysis" told the voters that, as a charter city, Vista's city council "replaces the state legislature with regard to the municipal affairs of the City[, which] . . . include bidding and contracting procedures . . . ."  (City of Vista Sample Ballot & Voter Information Pamp., Special Municipal Elec., June 5, 2007,

---

[1]      " 'The Government Code classifies cities as either "general law cities" (cities organized under the general law of California) or "chartered cities" (cities organized under a charter).  [Citations.] . . .  [A] general law city . . . must comply with state statutes that specify requirements for entering into contracts.  [Citations.]' "  (*City of Orange v. San Diego County Employees Retirement Assn.* (2002) 103 Cal.App.4th 45, 52.)

2

analysis of Prop. C, p. 003.)  That same point was made in the ballot argument in favor of the proposal, signed by the mayor and members of the city council, which also noted that the conversion would allow the city to "choose when and if it pays 'prevailing wages.' " (*Id.*, argument in favor of Prop. C, p. 004.)  There was no opposing ballot argument.

The ballot measure passed with approximately 67 percent of the votes cast. Shortly thereafter, Vista amended a city ordinance to prohibit any city contract from requiring payment of prevailing wages unless (a) such payment is compelled by the terms of a state or a federal grant, (b) the contract does not involve a municipal affair, or (c) payment of the prevailing wage is separately authorized by the city council.

In October 2007, Vista's city council adopted a resolution approving contracts to design and build two fire stations and authorizing the mayor to execute the contracts.  The contracts did not require compliance with the state's prevailing wage law.  A court action by plaintiff followed.

Plaintiff State Building and Construction Trades Council of California, AFL-CIO (the Union) is a labor federation composed of 131 local unions, 16 district labor councils, and 22 local building trades councils that collectively represent more than 300,000 men and women working in the construction industry in California.  The Union petitioned the San Diego County Superior Court for a peremptory writ of mandate to direct Vista and its officeholders to comply with the state's prevailing wage law.  Vista countered that prevailing wage issues are not a statewide concern, and that "charter cities have the legal right to determine whether or not to require 'prevailing wages' in local public works contracts that involve locally funded, 'municipal affairs' under the California Constitution and the laws governing charter cities."  The Union moved for issuance of a peremptory writ of mandate.  The Union argued that the prevailing wage law "addresses

3

important statewide concerns" and therefore it applies to charter cities "just as it applies to other cities." In support of its petition, the Union submitted a declaration of its president, Robert L. Balgenorth, asserting the regional nature of the construction industry and describing apprenticeship training in that industry. Vista opposed the motion, arguing that as a matter of law "Charter Cities have fiscal control over local 'municipal affairs' and these Cities can determine whether to include 'prevailing wage' requirements in local public works contracts."

The trial court denied the Union's petition, citing *Vial v. City of San Diego* (1981) 122 Cal.App.3d 346. *Vial* concerned a city council resolution adopted by San Diego (a charter city) that barred payment of prevailing wages except in specified circumstances. The state sought to compel the city to comply with the state's prevailing wage law. (*Id.* at p. 347.) The Court of Appeal in *Vial* upheld the city's resolution, stating that the expenditure of city funds on public works projects and the rates of pay of workers hired for such projects are municipal affairs of a charter city over which the state has no legislative authority. (*Id.* at p. 348.)

The Union here appealed. In a two-to-one decision, the Court of Appeal affirmed the trial court. After observing that both the legislative record and the trial court record were inadequate to establish that application of the prevailing wage law to charter cities is necessary to protect regional labor markets, the Court of Appeal concluded that the Union had failed to prove the existence of a statewide concern. In the dissent's view, however, the wage levels of contract workers constructing public works can have a depressive effect on regional wages, and therefore they are a statewide concern.

We granted the Union's petition for review to decide whether the state's prevailing wage law applies to charter cities.

4

## II. DISCUSSION

### A. California's Prevailing Wage Law

In 1931, the California Legislature enacted the state's prevailing wage law.[2] That law, which was then entitled the Public Wage Rate Act, required contractors on "public works" projects to pay "the general prevailing rate of per diem wages for work of a similar character in the locality in which the work is performed." (Stats. 1931, ch. 397, § 1, p. 910.) The term "public works" was defined as work done for public agencies and work paid for with public funds. (*Id.*, § 4, pp. 911-912.) The law expressly referred to charter cities in a provision requiring such cities to pay prevailing wages in contracts for street or sewer improvement work. (*Ibid.*)

Earlier the same year, Congress had enacted the Davis-Bacon Act (Pub. L. 71-798 (Mar. 3, 1931) 46 Stat. 1494, codified at 40 U.S.C. §§ 3141-3148); the goals of the federal and the state legislation were similar. (See, e.g., *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.* (1997) 519 U.S. 316, 319.) Simply put, "[p]revailing wage laws are based on the . . . premise that government contractors should not be allowed to circumvent locally prevailing labor market conditions by importing cheap labor from other areas." (*Independent Roofing Contractors v. Department of Industrial Relations* (1994) 23 Cal.App.4th 345, 356.) Many states have adopted some form of a prevailing wage law for public construction projects. (See, e.g., 820 Ill. Comp. Stat. 130/1 to 130/12; N.Y. Labor Law § 220(3)(a); 43 Pa. Cons. Stat. §§ 165-1 to 165-17; Tex. Gov. Code Ann. §§ 2258.001 to 2258.058.)

---

[2] The prevailing wage law replaced a law from the late 19th century that required payment of at least $2.00 per day for labor on public works. (Stats. 1897, ch. 88, § 1, p. 90.)

When the California Legislature established the Labor Code in 1937, it replaced the 1931 Public Wage Rate Act with a revised, but substantively unchanged, version of the same law. (Stats. 1937, ch. 90, § 1720 et seq., pp. 241-246.) The 1937 law, like the 1931 law, directed the "body awarding any contract" to "ascertain the general prevailing rate of per diem wages in the locality . . . for each craft or type of workman needed to execute the contract." (Stats. 1937, ch. 90, § 1773, p. 243; see also Stats. 1931, ch. 397, § 2, p. 910.) As a result of a 1976 amendment, the prevailing wage law now requires that local wage rates be determined by the Director of California's Department of Industrial Relations rather than by the body awarding the contract (Stats. 1976, ch. 281, § 2, p. 587), but the prevailing wage law's general purpose and scope remain largely unchanged.

Here, Vista contends that it need not comply with the prevailing wage law because the law invades Vista's constitutionally guaranteed autonomy as a charter city. In resolving the issue, we begin with a brief overview of the home rule doctrine set forth in the California Constitution.

### B.  California's Home Rule Doctrine

Charter cities are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs. Article XI, section 5, subdivision (a) of the California Constitution provides:  "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations *in respect to municipal affairs*, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and *with respect to municipal affairs* shall supersede all laws

6

inconsistent therewith." (Italics added.) The roots of this provision trace back more than 100 years. (See generally *Johnson v. Bradley* (1992) 4 Cal.4th 389, 394-398.) It was originally "enacted upon the principle that the municipality itself knew better what it wanted and needed than the state at large, and to give that municipality the exclusive privilege and right to enact direct legislation which would carry out and satisfy its wants and needs." (*Fragley v. Phelan* (1899) 126 Cal. 383, 387 (lead opn. by Garoutte, J.).) The provision represents an "affirmative constitutional grant to charter cities of 'all powers appropriate for a municipality to possess . . .' and [includes] the important corollary that 'so far as "municipal affairs" are concerned,' charter cities are 'supreme and beyond the reach of legislative enactment.' " (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 12, quoting *Ex Parte Braun* (1903) 141 Cal. 204, 207.)

In *California Fed. Savings*, *supra*, 54 Cal.3d 1, we set forth an analytical framework for resolving whether or not a matter falls within the home rule authority of charter cities. First, a court must determine whether the city ordinance at issue regulates an activity that can be characterized as a "municipal affair." (*Id.* at p. 16.) Second, the court "must satisfy itself that the case presents an actual conflict between [local and state law]." (*Ibid.*) Third, the court must decide whether the state law addresses a matter of "statewide concern." (*Id.* at p. 17.) Finally, the court must determine whether the law is "reasonably related to . . . resolution" of that concern (*ibid.*) and "narrowly tailored" to avoid unnecessary interference in local governance (*id.* at p. 24). "If . . . the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related to its resolution [and not unduly broad in its sweep], then the conflicting charter city measure ceases to be a 'municipal affair' pro tanto and the Legislature is not prohibited by article XI, section 5(a), from addressing the statewide dimension by its own tailored enactments." (*Id.* at p. 17.)

7

Here, we reaffirm our view — first expressed 80 years ago (see *City of Pasadena v. Charleville* (1932) 215 Cal. 384, 389 (*Charleville*)) — that the wage levels of contract workers constructing locally funded public works are a municipal affair (that is, exempt from state regulation), and that these wage levels are not a statewide concern (that is, subject to state legislative control).  Our reasons are set forth in the course of the analysis given below.

### C.  Applicability of California's Home Rule Doctrine Is a Question of Law

The Court of Appeal treated the dispute in this case as a factual one, and it characterized its decision against the Union in terms of a failure of proof.  For example, the court observed:  "[T]he question we face is whether either the Legislature or the [Union] ha[s] demonstrated a fact-bound justification for application of the [prevailing wage law] to charter cities.  As we explain more fully, we do not find any such justification on the record presented."  Later in its opinion, the Court of Appeal said:  "[T]he Legislature has not articulated any rationale which would support the conclusion that complete preemption of municipal public works contracting is needed to protect regional labor markets."  With regard to the evidentiary record made by the Union, the court said:  "Plainly . . . [various parts of the trial court record] establish that the labor markets in the construction trades are regional rather than local. . . .  [However,] the factual record presented by the [Union] offers no evidence which suggests the contracting activity of municipalities materially impacts regional labor markets."

Thus, the Court of Appeal here did not hold that the wage levels of contract workers constructing a locally funded public work are categorically a municipal affair and not a statewide concern.  Rather, the Court of Appeal held that the legislative record was inadequate to establish a statewide concern and that the Union had failed to prove its case in the trial court.

The Court of Appeal's approach raises the question whether the determination of a statewide concern presents predominantly a legal or a factual question. Fundamentally, the question is one of constitutional interpretation; the controlling inquiry is how the state Constitution allocates governmental authority between charter cities and the state. The answer to that constitutional question does not necessarily depend on whether the municipal activity in question has some regional or statewide effect. For example, we have said that the salaries of charter city employees are a municipal affair and not a statewide concern regardless of any possible economic effect those salaries might have beyond the borders of the city. (*Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 316-317 (*Sonoma County*).)

Of course, the inquiry is not wholly removed from historical, and hence factual, realities. In *California Fed. Savings*, *supra*, 54 Cal.3d at pages 17 to 18, for example, we said: "[C]ourts should avoid the error of 'compartmentalization,' that is, of cordoning off an entire area of governmental activity as either a 'municipal affair' or one of statewide concern. Beginning with the observation in *Pac. Tel. & Tel. Co. v. City and County of S.F.* [(1959)] 51 Cal.2d [766,] 771, that '*the constitutional concept of municipal affairs is not a fixed or static quantity . . . [but one that] changes with the changing conditions upon which it is to operate*,' our cases display a growing recognition that 'home rule' is a means of adjusting the political relationship between state and local governments in discrete areas of conflict. When a court invalidates a charter city measure in favor of a conflicting state statute, the result does not necessarily rest on the conclusion that the subject matter of the former is not appropriate for municipal regulation. It means, rather, that *under the historical circumstances presented*, the state has a more substantial interest in the subject than the charter city." (Italics added.)

9

Nevertheless, the question whether in a particular case the home rule provisions of the California Constitution bar the application of state law to charter cities turns ultimately on the meaning and scope of the state law in question and the relevant state constitutional provisions. Interpreting that law and those provisions presents a legal question, not a factual one. (*County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 286-287 (*County of Riverside*); *Sonoma County*, *supra*, 23 Cal.3d at p. 316; *Bishop v. City of San Jose* (1969) 1 Cal.3d 56, 63 (*Bishop*).) Courts accord great weight to the factual record that the Legislature has compiled (*California Fed. Savings*, *supra*, 54 Cal.3d at pp. 20-25; *Baggett v. Gates* (1982) 32 Cal.3d 128, 136-137), and also to any relevant facts established in trial court proceedings. (*California Fed. Savings*, at p. 20, fn. 16.) Factual findings by the Legislature or the trial court, however, are not controlling. (*Bishop*, at p. 63.) The decision as to what areas of governance are municipal concerns and what are statewide concerns is ultimately a legal one.

Therefore, the Court of Appeal here gave too much weight to the Union's asserted failure to prove its case, implying that the issue before the court was one of sufficiency of the evidence. The answer to whether the prevailing wage law can be applied constitutionally to charter cities is not conclusively determined solely by the evidentiary record in the trial court or by the legislative record. The question remains one of state constitutional interpretation. (*County of Riverside*, *supra*, 30 Cal.4th at pp. 286-287; *Sonoma County*, *supra*, 23 Cal.3d at p. 316; *Bishop*, *supra*, 1 Cal.3d at p. 63.)

### D. Application of *California Fed. Savings*'s Four-Part Test

We now apply the four-part test of this court's 1991 decision in *California Fed. Savings*, *supra*, 54 Cal.3d at pages 16 to 17, which we summarized at page 7, *ante*.

10

### 1. *Whether the wages of contract workers constructing locally funded public works are a municipal affair*

The wage levels of contract workers constructing locally funded public works are certainly a "municipal affair." We said so explicitly in our 1932 decision in *Charleville*, *supra*, 215 Cal. at page 389, which was the test case we took immediately after the Legislature's 1931 enactment of the prevailing wage law to decide whether that law applied to charter cities. *Charleville* was a mandate action brought to compel a charter city's manager to sign a contract for the construction of a fence around a city-owned reservoir. (*Id.* at p. 387.) The city manager refused to sign the contract, contending (among other things) that the contract did not comply with the state's newly enacted prevailing wage law. (*Ibid.*) The petition for a writ of mandate asserted that the prevailing wage law did not apply to charter cities, and this court agreed.

We there held that the issue of wage levels of contract workers improving a city-owned reservoir was, as a matter of law, a "municipal affair." (*Charleville*, *supra*, 215 Cal. at p. 389.) We said: "The sole purpose of the contract is the construction of a wire fence around a reservoir which is a part of the city's municipal water system. The supplying of water by a city to its inhabitants is a municipal affair. [Citation.] The building of a dam to be used for impounding water for a municipal water system is a municipal affair. [Citation.] The construction of a reservoir as a part of a municipal water system is a municipal affair. [Citation.] The money to be expended for the cost of the improvement belongs to the city and the control of its expenditure is a municipal affair. [Citation.] The hiring of employees generally by the city to perform labor and services in connection with its municipal affairs and the payment of the city's funds for services rendered to the city by its employees in the administration of its

11

municipal affairs is not subject to or controlled by general laws. [Citations.]" (*Ibid.*)

It is apparent from our analysis in *Charleville*, *supra*, 215 Cal. at page 389, that the construction of a *city-operated facility* for the benefit of a *city's inhabitants* is quintessentially a municipal affair, as is the control over *the expenditure of a city's own funds*. Here, the two fire stations in the City of Vista, like the municipal water system in *Charleville*, *supra*, 215 Cal. 384, are facilities operated by the city for the benefit of the city's inhabitants, and they are financed from the city's own funds. We conclude therefore that the matter at issue here involves a "municipal affair."

### 2. Existence of an "actual conflict" between state law and charter city law

This court's 1991 decision in *California Fed. Savings*, *supra*, 54 Cal.3d at pages 16-17, emphasized the importance of determining, as a matter of statutory construction, that state law actually conflicts with local law before proceeding to the difficult state constitutional question of which law governs a particular matter. Here, no party contends that California's prevailing wage law exempts charter cities from its scope. Indeed, the prevailing wage law makes express reference to charter cities, defining " 'public works' " to include "[s]treet, sewer, or other improvement work . . . of any political subdivision or district [of the state], *whether the political subdivision or district operates under a freeholder's charter or not*." (Lab. Code, § 1720, subd. (a)(3), italics added; see also *id.*, subd. (a)(1) [applying the law to any construction work "done under contract and paid for . . . out of public funds"].) Because the state's prevailing wage law does not exempt charter cities, and because Vista's ordinance prohibits compliance with that law (except in circumstances not relevant here), we conclude that an actual conflict exists between state law and Vista's ordinance.

12

### 3. *Whether the wage levels of contract workers constructing locally funded public works is a statewide concern*

When, as here, state law and the ordinances of a charter city actually conflict and we must decide which controls, "the hinge of the decision is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations." (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 18.) In other words, for state law to control there must be something more than an abstract state interest, as it is always possible to articulate some state interest in even the most local of matters. Rather, there must be "a convincing basis" for the state's action — a basis that "justif[ies]" the state's interference in what would otherwise be a merely local affair. (*Ibid.*) Here, that convincing justification is not present.

We reached essentially the same conclusion when we addressed the question in our 1932 decision in *Charleville*, *supra*, 215 Cal. 384. We there held that the wage levels of contract workers improving a city-owned reservoir were not a matter of "general state concern." (*Id.* at p. 393.) Likewise, the wage levels of contract workers designing and constructing two city-operated fire houses do not appear to be a matter of "general state concern." The Union, however, argues that circumstances have changed since our 1932 *Charleville* decision, and that what was *not* a statewide concern then has since *become* a statewide concern. The Union quotes a statement by this court in *Pac. Tel. & Tel. Co. v. City & County of S.F.*, *supra*, 51 Cal.2d 766, at page 771: "[T]he constitutional concept of municipal affairs is not a fixed or static quantity. It changes with the changing conditions upon which it is to operate. What may at one time have been a matter of local concern *may at a later time become a matter of state concern controlled by the general laws of the state*." (Italics added.)

13

The Union points out that as a result of a 1976 amendment to the state's prevailing wage law (Stats. 1976, ch. 281, § 2, p. 587), the wage levels mandated by that law are no longer set by the local body awarding the contract but by the Director of the Department of Industrial Relations, and under the amended law, these mandatory wage levels reflect regional rather than simply local interests (Lab. Code, §§ 1770, 1773, 1773.1, 1773.9). In light of these statutory changes, the Union argues, the wage levels of contract workers constructing locally funded public works have become a matter of statewide concern.

In a related argument, the Union contends that the economy of the state has become more integrated during the 80 years since this court's 1932 decision in *Charleville*, *supra*, 215 Cal. 384, and wage levels in a local area are now more likely to have an effect regionally and statewide. The construction industry in particular, according to the Union, has followed this trend toward economic regionalization, with workers often driving long distances to a job site and multi-employer collective bargaining agreements governing the terms of employment on a regional basis. Because of these economic changes, the Union asserts, the refusal of charter cities to pay prevailing wages has a depressive impact on regional labor standards that was not present in 1932 when *Charleville* was decided. Therefore, the Union argues, the expenditure of city funds on a local public work is no longer a purely local concern; rather, in light of our modern integrated economy, it has become a statewide concern.

The Union further notes that the state's prevailing wage law now requires contractors on public works projects to hire apprentices from state-approved apprenticeship programs, thereby ensuring the proper training of the next generation of skilled construction workers. (Lab. Code, § 1777.5.) The Union contends that this requirement of the prevailing wage law is essential to California's long-term economic health. If the prevailing wage law did not

14

include this requirement, the Union argues, then construction contractors bidding competitively on public works projects would refuse to hire apprentices, in an effort to reduce costs; apprentices then might not be able to obtain enough work to support themselves and to complete their on-the-job training requirement. The Union asserts that the training of the next generation of skilled construction workers is a statewide concern, not merely a local concern, and the prevailing wage law has become an integral part of the state's scheme for training these workers.

These arguments by the Union underscore the importance of identifying correctly the question at issue. Certainly regional labor standards and the proper training of construction workers are statewide concerns *when considered in the abstract*. But the question presented here is not whether the state government has an abstract interest in labor conditions and vocational training. Rather, the question presented is whether the state can require a charter city to exercise its purchasing power in the construction market in a way that supports regional wages and subsidizes vocational training, while increasing the charter city's costs. No one would doubt that the state could use *its own* resources to support wages and vocational training in the state's construction industry, but can the state achieve these ends by interfering in the fiscal policies of charter cities? Autonomy with regard to the expenditure of public funds lies at the heart of what it means to be an independent governmental entity. " '[W]e can think of nothing that is of greater municipal concern than how a city's tax dollars will be spent; nor anything which could be of less interest to taxpayers of other jurisdictions.' " (*Johnson v. Bradley*, *supra*, 4 Cal.4th at p. 407.) Therefore, the Union here cannot justify state regulation of the spending practices of charter cities merely by identifying some indirect effect on the regional and state economies. (See *County of Riverside*, *supra*, 30 Cal.4th at p. 296 ["No doubt almost anything a county does . . . can have

15

consequences beyond its borders.  But this circumstance does not mean this court may eviscerate clear constitutional provisions, or the Legislature may do what the Constitution expressly prohibits it from doing."].)

The Union's arguments also conflict with our previous decisions.  In *Sonoma County*, *supra*, 23 Cal.3d at page 297, we held that the wages paid by a charter city or county to *its own* employees are a municipal affair and therefore are not subject to regulation by the state Legislature.  In that case, the state offered to distribute surplus state funds to local governments to mitigate the impact of Proposition 13.[3]  The Legislature, however, then enacted a special provision prohibiting the distribution of surplus state funds to any local agency that granted to its employees a cost-of-living wage or salary increase that exceeded the cost-of-living increase provided to state employees.  At issue was whether the latter provision violated the home rule doctrine of the California Constitution.  (*Sonoma County*, at pp. 314-318.)  We emphasized in *Sonoma County* that the determination of what constitutes a municipal affair (over which the state has no legislative authority) and what constitutes a statewide concern (as to which state law is controlling) is a matter for the courts, not the Legislature, to decide.  (*Id.* at p. 316, citing *Bishop*, *supra*, 1 Cal.3d 56.)  Moreover, that the Legislature chose to deal with a problem on a statewide basis, *Sonoma County* said, does not in itself make the problem a statewide concern.  (*Sonoma County*, at p. 316.)  Put differently, the concept of statewide concern is not coextensive with the state's police power.  Citing numerous cases and an explicit provision of the state Constitution, *Sonoma County* concluded that the salaries of local employees of a

_____

[3]     Proposition 13, an initiative measure that the California electorate passed on June 6, 1978, added article XIII A to the California Constitution, placing significant limits on the taxing power of local and state governments.

charter city are a municipal affair not subject to the state's general laws.  (*Id.* at pp. 316-317.)

Similarly, in *San Francisco Labor Council v. Regents of University of California* (1980) 26 Cal.3d 785 (*S.F. Labor Council*), we rejected an effort by the state Legislature to compel the Regents of the University of California to pay prevailing wages to university employees.  Under article IX, section 9 of the California Constitution, the University of California enjoys an autonomy like that of charter cities under article XI, section 5.  Specifically, article IX, section 9 provides that the University of California shall have "full powers of organization and government," subject only to a few narrow exceptions.  Significantly, one of the exceptions pertains to state legislation that "regulates matters of *statewide concern* not involving internal university affairs."  (*S.F. Labor Council*, at p. 789, italics added.)  Relying on *Sonoma County*, *supra*, 23 Cal.3d 296, we concluded that the state's prevailing wage requirement was "not a matter of statewide concern."  (*S.F. Labor Council*, at p. 790.)  We observed that "while the statute purports to establish a minimum wage, it in effect determines the wage."  (*Ibid.*)  We then stated:  "Although the Legislature has declared that the matter is one of statewide concern [citation], the declaration is not controlling . . . ."  (*Id.* at pp. 790-791.)

As discussed above, *Sonoma County*, *supra*, 23 Cal.3d 296, involved the autonomy rights of charter cities and counties, and *S.F. Labor Council*, *supra*, 26 Cal.3d 785, applied *Sonoma County*'s holding to a case involving a state prevailing wage law analogous to the one at issue here.  Read together, *Sonoma County* and *S.F. Labor Council* indicate our continued adherence to the holding in *Charleville*, *supra*, 215 Cal. 384, that charter cities are not subject to the state's prevailing wage law.

17

More recently, in *County of Riverside*, *supra*, 30 Cal.4th 278, we reaffirmed that compensation of public employees is not a statewide concern justifying state law interference in the autonomy of independent governmental entities. We there concluded that state law could not force a county into binding arbitration over the compensation paid to county employees. Our decision applied two state constitutional provisions: one giving all counties authority to "provide for the . . . compensation . . . of [their] employees" (Cal. Const., art. XI, § 1, subd. (b)), the other prohibiting the Legislature from "delegat[ing] to a private person or body power to . . . interfere with county or municipal corporation . . . money" (*id.*, § 11, subd. (a)). In the course of our analysis, we considered whether the state law at issue might be enforceable because it governed a matter of statewide concern. (*County of Riverside*, at pp. 286, 291.) We rejected the Legislature's assertion that the matter involved a statewide concern. (*Id.* at pp. 286-287.) Instead, we concluded that the state law in question impinged too much on local rights, "*depriving* the county entirely of its authority to set employee salaries." (*Id.* at p. 288; see also *id.* at p. 293.) We also drew an important distinction between state *procedural* laws governing the affairs of local governmental entities (which by their nature impinge less on local affairs) and state laws dictating the *substance* of a public employee labor issue (which impinge much more on local affairs). (*Id.* at p. 289.)

Although the three cases just cited — *Sonoma County*, *supra*, 23 Cal.3d 296, *S.F. Labor Council*, *supra*, 26 Cal.3d 785, and *County of Riverside*, *supra*, 30 Cal.4th 278 — deal with the wages of *public employees* rather than, as here, the wages of *private employees* constructing local public works projects, the distinction is irrelevant. The Union's arguments here do not depend on whether the workers constructing the public work are public or private employees. If, as the Union contends, the prevailing wage law's shift from a purely local focus to a

18

regional focus has made the wage levels of workers constructing locally funded public works a matter of statewide concern, then that would be true whether the case involved public employees or private employees. Similarly, if, as the Union asserts, the state's economic integration during the 80 years since our 1932 decision in *Charleville*, *supra*, 215 Cal. 384, has made the wages of workers constructing local public works a matter of statewide concern, then that would be true for both public employees and private employees.

Significantly, this case is not like others in which we found a statewide concern to justify the application of a state law to charter cities. For example, our cases have suggested that a state law of broad general application is more likely to address a statewide concern than one that is narrow and particularized in its application. (*S.F. Labor Council*, *supra*, 26 Cal.3d at pp. 789-790; *Charleville*, *supra*, 215 Cal. at p. 390.) We applied this principle in *People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach* (1984) 36 Cal.3d 591, 600, and *Professional Fire Fighters, Inc. v. City of Los Angeles* (1963) 60 Cal.2d 276, 294-295. In the latter two cases, we also noted that the state laws at issue set forth generally applicable *procedural* standards, and consequently impinged less on local autonomy than if they had imposed substantive obligations. In *Seal Beach*, for example, we said: "[T]here is a clear distinction between the *substance* of a public employee labor issue and the *procedure* by which it is resolved. Thus there is no question that 'salaries of local employees of a charter city constitute municipal affairs and are not subject to general laws.' ([*Sonoma County*], *supra*, 23 Cal.3d at p. 317.) Nevertheless, the process by which salaries are fixed is obviously a matter of statewide concern and none could, at this late stage, argue that a charter city need not meet and confer concerning its salary structure." (*Seal Beach*, at pp. 600-601, fn. 11; see also *County of Riverside*, *supra*, 30 Cal.4th at p. 289.)

19

Here, the state law at issue is not a minimum wage law of broad general application; rather, the law at issue here has a far narrower application, as it pertains only to the public works projects of public agencies. In addition, it imposes substantive obligations on charter cities, not merely generally applicable procedural standards. These distinctions further undermine the Union's assertion that the matter here presents a statewide concern and therefore requires Vista, a charter city, to comply with the state's prevailing wage law on the city's locally funded public works projects.

We are aware that the Legislature has recently stated that the wage levels of contract workers constructing locally funded public works are a matter of statewide concern. The Legislature's view is expressed in two amendments to the prevailing wage law, one in 2002 and the other in 2003, each addressing a relatively narrow category of public works. Uncodified sections of both amendments state: "It is a matter of *statewide concern* that *every public agency* in California pay the prevailing rate of per diem wages to workers employed on public works projects undertaken by those public agencies." (Stats. 2003, ch. 851, § 1, p. 6247, italics added; Stats. 2002, ch. 892, § 1, p. 5541, italics added; see also Stats. 2002, ch. 868, § 1, p. 5455.) Likewise, a 2003 concurrent resolution of the Legislature stated in relevant part: "[T]he Legislature reaffirms its intent for the state prevailing wage law to apply broadly to all projects subsidized with public funds, including the projects of chartered cities, as the law addresses important statewide concerns . . . ." (Sen. Conc. Res. No. 49, Stats. 2003 (2003-2004 Reg. Sess.) res. ch. 135, p. 6834.)

But as we noted earlier (see pt. II.C., *ante*), the Legislature's view as to what constitutes a statewide concern is not determinative in resolving the constitutional question before us. This court considered similar legislative findings in regard to the statute requiring the Regents of the University of

20

California to pay prevailing wages, and the court concluded that those findings were not controlling. (*S.F. Labor Council*, *supra*, 26 Cal.3d at pp. 790-791; see also *County of Riverside*, *supra*, 30 Cal.4th at pp. 286-287.) Although we give such statements by the Legislature great weight (*Baggett v. Gates*, *supra*, 32 Cal.3d at p. 136), the resolution of constitutional challenges to state laws falls within the *judicial* power, not the *legislative* power. (*County of Riverside*, at pp. 286-287; *Sonoma County*, *supra*, 23 Cal.3d at p. 316; *Bishop*, *supra*, 1 Cal.3d at p. 63.) " 'It is, emphatically, the province and duty of the judicial department, to say what the law is.' " (*McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 469, quoting *Marbury v. Madison* (1803) 5 U.S. 137, 177; see also *Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1068.) Moreover, we are "especially" hesitant to abdicate to the Legislature's view of the issue "when [as here] the issue involves the division of power between local government and that same Legislature." (*County of Riverside*, at p. 286.)

In this case, we conclude that no statewide concern has been presented justifying the state's regulation of the wages that charter cities require their contractors to pay to workers hired to construct locally funded public works. In light of our conclusion that there is no statewide concern here, we need not determine whether the state's prevailing wage law is "reasonably related to . . . resolution" of that concern (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 17) and is "narrowly tailored" to avoid unnecessary interference in local governance (*id.* at p. 24). The trial court here was correct to deny plaintiff Union's petition for a writ of mandate, and the Court of Appeal properly affirmed the trial court's judgment.

21

**DISPOSITION**

We affirm the judgment of the Court of Appeal, which in turn affirmed the trial court's judgment denying the Union's petition for a writ of mandate.

KENNARD, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
BAXTER, J.
CHIN, J.
CORRIGAN, J.

**DISSENTING OPINION BY WERDEGAR, J.**


This case requires that we resolve a dispute between the Legislature and a charter city, two entities granted specific lawmaking authority by our state Constitution. On the one hand, "[t]he legislative power of this State is vested in the California Legislature which consists of the Senate and Assembly . . . ." (Cal. Const., art. IV, § 1.) The state Legislature wields "the entire law-making authority of the state, except the people's right of initiative and referendum" and "may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution." (*Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691.) On the other hand, under what is alternately called the "municipal home rule" or "municipal affairs" doctrine, charter cities are empowered to "make and enforce all ordinances and regulations in respect to municipal affairs," and such ordinances "shall supersede all laws inconsistent therewith." (Cal. Const., art. XI, § 5, subd. (a).)

In this case, the Legislature exercised its lawmaking powers to enact sections 1720 to 1861 of the Labor Code, commonly referred to as the prevailing wage law, which generally *requires* payment of the prevailing wage to workers on publicly funded construction projects. By contrast, defendant City of Vista (Vista), a charter city, exercised its lawmaking powers to enact an ordinance that (in most instances) *prohibits* city contracts from requiring the payment of the

1

prevailing wage. In this area of overlapping lawmaking authority, a constitutional tension exists.

This court is the final arbiter of the meaning of the California Constitution. Unlike when we interpret state statutory law or federal constitutional law, where our decisions can be overturned by, respectively, the Legislature or the United States Supreme Court, we are the last word on the meaning of the state Constitution. If we err, our decision can be corrected only by an amendment to that Constitution. Accordingly, when approaching a dispute between the Legislature and a charter city under the municipal affairs doctrine, we are charged with a solemn and delicate obligation to fairly balance conflicting interests and reasonably resolve the tension inherent in such disputes.

The majority's approach to this case is neither fair nor reasonable. Instead, the majority goes astray by making a series of analytical missteps. First, in concluding Vista's ordinance comes within the protected zone of municipal affairs, the majority places unjustified weight on Vista's fiscal interest in saving money on the construction of public buildings, and relies on an outmoded Depression Era decision that interpreted a different law (maj. opn., *ante*, at pp. 11-12) long ago eclipsed by more modern economic ideas.

Second, by failing to appreciate the full impact of the prevailing wage law, the majority significantly undervalues the statewide economic concerns the law addresses, and fails to accord appropriate weight to the Legislature's express findings and declarations that the prevailing wage law should apply to charter cities and that it addresses a matter of statewide concern. Finally, the majority fails to recognize the difference—critical in the context of municipal governance and independence—between state regulations affecting *public* employees and those affecting *private* employees who contract with the city.

For these reasons, I dissent.

2

# I. DISCUSSION

As the majority recognizes, we resolve disputes over the scope of the municipal affairs doctrine by applying the test set forth in *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1 (*California Fed. Savings*). Preliminarily, we ask whether a charter city's exercise of legislative power falls within the zone of its municipal affairs and, if so, whether compliance with the local ordinance conflicts with state law. If a court determines that a local law addresses a matter within the municipal affairs of the charter city and that it conflicts with a state law, the court must then decide whether the state law addresses a matter of "statewide concern"—what the *California Fed. Savings* court termed "the bedrock inquiry through which the conflict between state and local interests is adjusted." (*Id.* at p. 17.) "If the subject of the statute fails to qualify as one of statewide concern, then the conflicting charter city measure is a 'municipal affair' and 'beyond the reach of legislative enactment.' " (*Ibid.*) But if "the court is persuaded that the subject of the state statute is one of statewide concern and that the statute is reasonably related to its resolution, then the conflicting charter city measure ceases to be a 'municipal affair' pro tanto and the Legislature is not prohibited by article XI, section 5(a), from addressing the statewide dimension by its own tailored enactments." (*Ibid.*)

Requiring a showing of "statewide concern" as a condition of "state legislative supremacy" requires the state to articulate a dimension to the state law that "demonstrably transcend[s] identifiable municipal interests." (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 17.) This in turn tends to ensure that "areas which are of intramural concern only" will not be invaded by the state, thereby "preserving core values of charter city government." (*Ibid.*)

As the majority acknowledges, the issue we decide today is a legal, not a factual, one (maj. opn., *ante*, at p. 10), and in resolving it we must undertake an

3

evaluation of the facts and circumstances of each individual case, exercising independent review.  (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 24, fn. 21.) "[T]he Legislature is empowered neither to determine what constitutes a municipal affair nor to change such an affair into a matter of statewide concern."  (*Bishop v. City of San Jose* (1969) 1 Cal.3d 56, 63.)  "[W]hat constitutes a matter of statewide concern is ultimately an issue for the courts to decide . . . ."  (*Baggett v. Gates* (1982) 32 Cal.3d 128, 136.)  So too, a city's claim that some matter falls within the protected zone of the municipal affairs doctrine will be decided not by the city, but by the courts.

### A.  Does Vista's Ordinance Come Within the Protected Zone of Municipal Affairs?

The majority asserts that "[t]he wage levels of contract workers constructing locally funded public works are certainly a 'municipal affair.' " (Maj. opn., *ante*, at p. 11.)  No citation to authority is required to conclude that the provision and financing of a proper city infrastructure, whether it be housing, hospitals, libraries or other civic buildings, is the business of a city, chartered or otherwise.  Vista has imposed a citywide sales tax increase to pay for the cost of the design, construction and renovation of some of its civic buildings.  That these costs are to be borne by Vista alone, and not shared by the state, is a significant factor in favor of finding the public works at issue fall within the municipal affairs doctrine.  (See *Southern California Roads Co. v. McGuire* (1934) 2 Cal.2d 115, 121-122 [because "the entire cost" of an improvement to Sepulveda Blvd. in Los Angeles "is to be met and defrayed by the state," the road project is not strictly a municipal affair of the city].)

The question, however, is not whether the design and physical construction of Vista's civic buildings constitutes a municipal affair, as it does, but whether Vista's choice not to require the private construction firms with which it has

4

contracted (or will contract) to pay the state prevailing wage to its construction worker employees is also a matter within the city's municipal affairs. Vista contends a charter city's internal fiscal affairs, including labor and employment issues, necessarily fall within the municipal home rule doctrine. Of relevance is section 5, subdivision (b) of article XI of the California Constitution, which provides a nonexclusive list of the types of matters falling within the municipal home rule doctrine. That section provides: "It shall be competent in all city charters to provide, in addition to those provisions allowable by this Constitution, and by the laws of the State for: (1) the constitution, regulation, and government of the city police force (2) subgovernment in all or part of a city (3) conduct of city elections and (4) plenary authority is hereby granted, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several municipal officers and employees whose compensation is paid by the city shall be elected or appointed, and for their removal, and for their compensation, and for the number of deputies, clerks and other employees that each shall have, and for the compensation, method of appointment, qualifications, tenure of office and removal of such deputies, clerks and other employees."

In light of this constitutional provision, the salary level of the mayor and city council members clearly falls within a city's municipal affairs, as does the compensation level of the "city police force" as well as those city employees involved in the "subgovernment in all or part of a city" such as "deputies, clerks *and other employees*." (Cal. Const., art. XI, § 5, subd. (b), italics added; see *Bishop v. City of San Jose*, *supra*, 1 Cal.3d 56 [the Legislature did not intend the prevailing wage law to apply to electricians employed as city workers]; *Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d

5

296, 314-318 [a state law precluding a salary increase for city and county employees violated the home rule provisions of the state Const.].)

But the more removed workers are from the heart of city government, the less the city's legitimate interest in controlling their compensation. This case, for example, involves no Vista employee. Vista has contracted (or intends to contract) with private design and construction firms, which in turn have hired (or will hire) private construction workers, who will be paid not by Vista but by the construction firms. If a firm underbids the project, it is the firm, not the city, that must still pay the workers. Accordingly, these contract workers cannot fairly be characterized as city employees who are necessary to maintain the "subgovernment in all or part of a city" (Cal. Const., art. XI, § 5, subd. (b), item (2)), nor considered "deputies, clerks and other employees" of the city (*id*., item (4)).

To reach its conclusion that Vista's zone of protected municipal affairs nevertheless includes the wages of private construction workers, the majority relies uncritically on *City of Pasadena v. Charleville* (1932) 215 Cal. 384 (*Charleville*). *Charleville* involved the Public Wage Rate Act of 1931 (PWRA of 1931), a law of significantly less scope and statewide impact than the modern prevailing wage law at issue in this case. More importantly, *Charleville*'s reasoning has been overtaken by history. In *Charleville* the court explained that the PWRA of 1931 was a law of limited scope because it did not "purport to fix or provide for the fixation of the wage to be paid *under all employment contracts, public and private*" (*Charleville*, at p. 390, italics added) and suggested that an act purporting to impose a broader, statewide regulation on wages would have encountered "difficulties of constitutional questions" (*ibid*., citing *Adkins v. Children's Hospital* (1923) 261 U.S. 525 [which invalidated a D.C. law imposing a minimum wage for women and minors]). *Adkins* was a notable exemplar of the

6

late *Lochner*[1] period in which the high court extolled the virtues of the freedom to contract over nearly all other freedoms. As is well known, the principles animating that bygone era of constitutional jurisprudence were thereafter repudiated by the United States Supreme Court, and *Adkins* itself was specifically overruled in *West Coast Hotel Co. v. Parrish* (1937) 300 U.S. 379, 400. (See generally *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 155-156.)

Contrary to *Charleville*'s premise that the United States Constitution prohibited state legislatures from imposing a minimum wage law, that the California Legislature may provide for minimum wages for workers is now firmly established. (Cal. Const., art. XIV, § 1 ["The Legislature may provide for minimum wages and for the general welfare of employees . . . ."].) Accordingly, whether a state may enforce laws such as the prevailing wage law to address matters of statewide concern has been untethered from the artificially created constitutional constraints of the *Lochner* era.

In light of this erosion of the legal assumptions underlying *Charleville*, *supra*, 215 Cal. 384, and because the PWRA of 1931 was markedly less extensive than the modern prevailing wage law, *Charleville* cannot be considered persuasive today. Moreover, given the obvious changes to our state's economy since 1932 when *Charleville* was decided, i.e., its growth and interdependence, the case was long ago eclipsed by more modern economic ideas. Common sense dictates that we abandon *Charleville* as precedent and consign it to the dustbin of history. (See *Pac. Tel. & Tel. Co. v. City & County of S. F.* (1959) 51 Cal.2d 766, 771 ["What may at one time have been a matter of local concern may at a later time become a matter of state concern controlled by the general laws of the state."].)

---

[1]     See *Lochner v. New York* (1905) 198 U.S. 45.

7

Because Vista's interest in controlling the wages of private contract workers is much less than its interest in dictating wage levels of its own employees, and absent the legitimizing effect of *Charleville*, *supra*, 215 Cal. 384, as precedent, the sole remaining consideration supporting Vista's assertion of its municipal autonomy is its desire to save money on its planned public works projects. Every government, state or local, naturally has an interest in conserving public funds. But this general desire is insufficient of itself to invoke the municipal affairs doctrine. Were it otherwise, no state law could ever prevail over local desires, for all conflicting state laws have the potential to increase a city's costs, whether it be to allow a city's firefighters to unionize (*Professional Fire Fighters, Inc. v. City of Los Angeles* (1963) 60 Cal.2d 276), require cities to meet and confer in good faith with employee representatives regarding wages and hours (*People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach* (1984) 36 Cal.3d 591), or give peace officers an administrative appeal before demoting them (*Baggett v. Gates*, *supra*, 32 Cal.3d 128). Vista must point to more than a ledger sheet to justify its contention that its ordinance falls within the municipal affairs doctrine.

### B. Does the Prevailing Wage Law Address a Matter of Statewide Concern?

The relative strength of Vista's interest in preserving its public fisc aside, the crux of this case is the majority's conclusion that the prevailing wage law fails to address a matter of statewide concern. (Maj. opn., *ante*, at p. 21.) In reaching that conclusion, the majority disregards the prevailing wage law's far-reaching economic impact on our state economy. The Legislature has recognized the scope of the prevailing wage law's statewide effect, having explicitly declared its intent in 2002 that "[p]ayment of the prevailing rate of per diem wages to workers employed on public works projects is necessary to attract the most skilled workers

8

for those projects and to ensure that work of the highest quality is performed on those projects" (Stats. 2002, ch. 892, § 1, subd. (a)(1), p. 5541), that "[p]ublic works projects should never undermine the wage base in a community, and requiring that workers on public works projects are paid the prevailing rate of per diem wages ensures that wage base is not lowered" (*id.*, subd. (a)(2)), and that it is a matter of "statewide concern" that public works undertaken by public agencies pay workers the prevailing wage (*id.*, subd. (a)(3)). A year later, in a 2003 concurrent resolution, the Legislature addressed the prevailing wage law specifically with regard to charter cities, declaring that "the state prevailing wage law [should] apply broadly to all projects subsidized with public funds, *including the projects of chartered cities*, *as the law addresses important statewide concerns . . . .*" (Sen. Conc. Res. No. 49, Stats. 2003 (2003-2004 Res. Sess.) res. ch. 135, p. 6834, italics added.)

These legislative statements are entitled to great weight (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 24, fn. 21 [give " 'great weight' " to "legislative statements of purpose"]; *Bishop v. City of San Jose*, *supra*, 1 Cal.3d at p. 63 [same]), a rule the majority acknowledges (maj. opn., *ante*, at p. 21) but fails to honor.

Even aside from the Legislature's considered views, that the prevailing wage law addresses substantial statewide concerns that would be undermined were charter cities allowed to opt out of the law is not a close question. As a general matter, we have held that the promotion of uniform fair labor standards is an important statewide concern sufficient to override local prerogatives. For example, we held in *People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach*, *supra*, 36 Cal.3d 591, that the meet-and-confer provision of the Meyers-Milias-Brown Act (MMBA) (Gov. Code, § 3505) was enforceable against the City of Seal Beach, a charter city, despite its city charter amendment providing, among

9

other things, for the immediate termination of any city employee who participated in a labor strike. We noted that one of the purposes of the MMBA was "to improve personnel management and employer-employee relations within the various public agencies" (*Seal Beach*, at p. 597), and that "[t]he meet-and-confer requirement is an essential component of the state's legislative scheme for regulating the city's employment practices" (*id*. at p. 599). As such, that state interest outweighed the city's admitted power—authorized by the state Constitution under article XI, section 3, subdivision (b)—to amend its city charter.

Similarly, in *Professional Fire Fighters, Inc. v. City of Los Angeles*, *supra*, 60 Cal.2d 276, the City of Los Angeles, a charter city, argued that application of Labor Code section 1960,[2] which guarantees firefighters the right to join a union, addressed a matter of "purely local concern," and that prior case law had held "that all matters connected with public employment in a chartered city are municipal affairs [citations]." (*Professional Fire Fighters*, at p. 291.) This court rejected the argument, explaining that an examination of the Legislature's intent when enacting section 1960 and several related statutes revealed "the Legislature was attempting to deal with labor relations on a statewide basis." (*Professional Fire Fighters*, at p. 294.) By enacting those state laws, the Legislature "adopted general policies and provided general rights and obligations of labor and management *throughout the state*." (*Ibid*., italics added.) "The total effect of all this legislation was not to deprive local government (chartered city or otherwise) of the right to manage and control its fire departments but to create *uniform fair*

---

**2** "Neither the State nor any county, political subdivision, incorporated city, town, nor any other municipal corporation shall prohibit, deny or obstruct the right of firefighters to join any bona fide labor organization of their own choice." (Lab. Code, § 1960.)

*labor practices throughout the state.* As such, the legislation may impinge upon local control to a limited extent, but it is nonetheless a matter of state concern." (*Id.* at pp. 294-295, italics added, quoted with approval in *Baggett v. Gates*, *supra*, 32 Cal.3d at p. 139.) "Labor relations are of the same statewide concern as workmen's compensation, liability of municipalities for tort, [and] perfecting and filing of claims . . . , all of which have been held to be governed by general law in contravention of local regulation by chartered cities." (*Professional Fire Fighters*, at p. 295.)

The prevailing wage law is to the same effect. Article XIV of the California Constitution is entitled "Labor Relations." Section 1 of that article provides that "[t]he Legislature may provide for minimum wages and for the general welfare of employees . . . ." The Legislature is thus granted specific constitutional authority to address labor issues on a statewide scale. It exercised that power by enacting the Labor Code, providing expressly that "[i]t is the policy of this state to vigorously enforce minimum labor standards in order to ensure employees are not required or permitted to work under substandard unlawful conditions or for employers that have not secured the payment of compensation, and to protect employers who comply with the law from those who attempt to gain a competitive advantage at the expense of their workers by failing to comply with minimum labor standards." (Lab. Code, § 90.5, subd. (a).)

By first enacting the PWRA in 1931, and then replacing it a few years later with the much expanded prevailing wage law, the Legislature created an economic framework, applicable throughout the state, protecting Californians who work in the construction trades and, by extension, the viability of the construction industry as a whole. "The overall purpose of the prevailing wage law is to protect and benefit employees on public works projects." (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 985.) "This general objective subsumes within it a number

11

of specific goals:  to protect employees from substandard wages that might be paid if contractors could recruit labor from distant cheap-labor areas; to permit union contractors to compete with nonunion contractors; to benefit the public through the superior efficiency of well-paid employees; and to compensate nonpublic employees with higher wages for the absence of job security and employment benefits enjoyed by public employees." (*Id.* at p. 987, quoted with approval in *City of Long Beach v. Department of Industrial Relations* (2004) 34 Cal.4th 942, 949.)

The evolution of the modern prevailing wage law strongly supports the Legislature's considered view that the wages paid on publicly funded construction projects impacts more than local concerns.  As the majority recognizes (maj. opn., *ante*, at pp. 14-15), wage schedules are now established at the state rather than the local level, and the state Director of the Department of Industrial Relations considers wage levels throughout regional economies instead of focusing on a particular locality.  This "trend toward economic regionalization" (maj. opn., *ante*, at p. 14) makes sense in the modern, post-1932 world (see dis. opn., *ante*, at pp. 6-7) where, as an expert for plaintiff State Building and Construction Trades Council of California, AFL-CIO (SBCTC) testified below, construction workers travel many miles from their homes to jobsites in the region.  To allow Oakland to pay construction workers significantly less than Berkeley, or Anaheim less than Santa Ana, would logically create downward pressure on wages[3] throughout the

---

[3]     The prevailing wage law affects more than just wages.  As SBCTC's expert stated below:  "Throughout the State, local craft unions and district labor councils have negotiated master labor agreements with contractors' associations that establish wages, fringe benefits and other terms of employment.  These collective bargaining agreements provide for uniform hourly wages, regardless of the contractor that is employing the worker, and require contractors to contribute to

(*footnote continued on next page*)

12

respective regions, leading to an economic race to the bottom, as contractors—union and nonunion—scramble to underbid competitors for construction contracts. When wages are sufficiently depressed, workers leave the construction trades, requiring California, when the state's economy is flush and construction projects could flourish, to import skilled construction workers from outside the state. That situation negatively affects not just a city's local economy, but California's state economy as a whole.

The prevailing wage law supports the statewide economy in a second way, mentioned but discounted by the majority (maj. opn., *ante*, at pp. 14-15), requiring contractors on public works projects to participate in a statewide apprenticeship program. This program allows apprentices in the construction trades to learn on the job, ensuring the state will be supplied with a steady stream of skilled and semi-skilled workers in the construction industry. "Between April and June 1994, California had 175 joint apprenticeship programs . . . ." (*California Div. of Labor Standards Enforcement v. Dillingham Constr., N. A., Inc.* (1997) 519 U.S. 316, 327, fn. 5.) According to SBCTC's expert, "[m]ore than 50,000 men and women are currently indentured in State-approved apprenticeship programs in the construction trades in California." The Legislature has declared that

(*footnote continued from previous page*)

the same multi-employer benefits plans, so workers will enjoy health care and pension benefits notwithstanding the lack of continuous employment with a single contractor. This labor relations structure enables signatory contractors to respond to fluctuating demands for labor and enables construction workers to maintain steady employment and to receive health and pension benefits that protect them and their families." (See Lab. Code, § 1773.1, subd. (a) [per diem wages under the prevailing wage law "shall be deemed to include employer payments for" health and welfare, pension, and vacation benefits]; see also *Franchise Tax Bd. v. Laborers Vacation Trust* (1983) 463 U.S. 1, 4, fn. 2 [describing a construction workers' regional trust fund to permit workers a paid vacation].)

"apprenticeship programs are a vital part of the educational system in California" (Stats. 1999, ch. 903, § 1, pp. 6605-6606) and that "[t]he state's system for promoting quality apprenticeship training in the construction trades depends upon the incentives provided by the prevailing wage law" (Sen. Conc. Res. No. 49, Stats. 2003 (2003-2004 Res. Sess.) res. ch. 135, p. 6834).

Allowing charter cities to opt out of the prevailing wage law undermines this program by affording them the benefit of it (by using workers trained in state apprenticeship programs) without their paying for the privilege. In his declaration below, SBCTC's expert explained: "Because of the unstable nature of construction-industry employment, a particular contractor might not be willing to invest the resources in training an apprentice for a multi-year period and might not be able to expose individual apprentices to all the different work processes necessary to become a journey-level worker in the craft. The current system of multi-employer apprenticeship programs allows the industry to share the costs, burdens and rewards of training new workers. The success of apprenticeship programs is vital to training the next generation of skilled construction workers in California."

"The prevailing wage law bolsters the State's apprenticeship training system by requiring contractors on public work who employ workers in apprenticeable crafts to use apprentices from state-approved programs to meet a specified minimum ratio of apprentice hours to journeyperson hours. The contractors are permitted to pay these apprentices at a lower wage rate. In this way, the prevailing wage law provides employment for apprentices so they can obtain the necessary on-the-job training in a variety of work processes to graduate from the programs." "Absent the prevailing wage law, contractors that invest in apprenticeship training would find themselves at a competitive disadvantage to contractors that do not invest in apprenticeship training. Non-participating

14

contractors could seek to hire apprenticeship-program graduates without having contributed to the cost of their training."

Against the considerable weight of the evidence that the prevailing wage law addresses an issue of statewide concern, the majority's answer is not to engage the issue, but to reframe the question. The majority thus asserts that the question is not whether regional labor standards and apprenticeship programs address an issue of statewide concern, but whether "the state can require a charter city to exercise its purchasing power in the construction market in a way that supports regional wages and subsidizes vocational training, while increasing the charter city's costs." (Maj. opn., *ante*, at p. 15.) What this reframing ignores is that the entire premise of the dispute before us, and the one that has continued to vex courts over the years, is that the state *can* sometimes override a city's local choices—even financial ones—so long as it has sufficient reason (i.e., with a state law addressed to strong statewide concerns).

Moreover, in focusing narrowly on Vista's costs, the majority fails to adhere to the *California Fed. Savings* test that requires us to use a wide-angle lens, cautioning that "courts should avoid the error of 'compartmentalization,' that is, of cordoning off an entire area of governmental activity as either a 'municipal affair' or one of statewide concern." (*California Fed. Savings*, *supra*, 54 Cal.3d at p. 17.) Thus, while the *effect* of the prevailing wage law, as the majority laments, may be that Vista and other charter cities pay more for their public works projects, the *purpose* of the prevailing wage law, which the majority ignores, is not to make them pay more but to stabilize and support the construction trades. The latter is unquestionably a matter of substantial statewide concern.

Finally, in reframing the question, the majority gives the prevailing wage law a cramped and limited construction, failing to appreciate the sweeping nature of the legislation and viewing it instead as an unwarranted control on local

15

spending priorities. But courts must give the prevailing wage law a liberal construction so that the general purpose and goals of the law are not defeated. (*City of Long Beach v. Department of Industrial Relations*, *supra*, 34 Cal.4th at p. 950; *McIntosh v. Aubry* (1993) 14 Cal.App.4th 1576, 1589 ["Courts will liberally construe prevailing wage statutes . . ."]; *State Building & Construction Trades Council of California v. Duncan* (2008) 162 Cal.App.4th 289, 324 [same].)

Having reframed the issue to be decided, the majority asserts the case is controlled by *Sonoma County Organization of Public Employees v. County of Sonoma*, *supra*, 23 Cal.3d 296, *San Francisco Labor Council v. Regents of University of California* (1980) 26 Cal.3d 785, and *County of Riverside v. Superior Court* (2003) 30 Cal.4th 278. (Maj. opn., *ante*, at pp. 16-18.) But one key factor distinguishes those cases: all involved the wages of (or labor disputes involving) a public entity's *actual employees*. While the municipal home rule doctrine is concerned with state intrusion into the affairs of cities, and the state Constitution specifically mentions certain city employees (Cal. Const., art. XI, § 5, subd. (b)), neither the home rule doctrine nor the three cases cited have much to say about those *not* employed by the city.

Unlike the public employees involved in *Sonoma County*, *San Francisco Labor Council*, and *County of Riverside*, the workers affected by the instant case are not, and cannot be considered, Vista's employees. They are workers in the construction trades—electricians, plumbers, roofers, landscapers, carpenters—who presumably have traveled from many areas in the region, and who have been, or will be, hired by the construction firms the city has engaged or will engage. None of the trio of cases cited by the majority undermines the conclusion that the prevailing wage law addresses a matter of substantial statewide concern for those *not employed* by charter cities, counties or the state's public universities.

16

The majority inexplicably finds this key factor "irrelevant." (Maj. opn., *ante*, at p. 18.) But a charter city's power to control the compensation of its employees, especially those integral to municipal governance, is expressly recognized by the state Constitution. (Cal. Const., art. XI, § 5, subd. (b).) The compensation of private contract workers is not.

## II. CONCLUSION

The California Legislature long ago decided that stabilizing the construction trades and ensuring a steady supply of skilled and semi-skilled workers in those trades was beneficial to our state's long-term economic health. Accordingly, the Legislature, like many other states,[4] the federal government,[5] and even some cities,[6] enacted a prevailing wage law, requiring public entities to pay

---

[4] Thirty-one states have enacted a prevailing wage law. (Alaska Stat. §§ 36.05.010 to 36.05.900; Ark. Code Ann. §§ 22-9-301 to 22-9-315; Conn. Gen. Stat. §§ 31-53 to 31-55a; Del. Code Ann., tit. 29, § 6960; Hawaii Rev. Stat. §§ 104-1 to 104-4; 820 Ill. Comp. Stat. 130/1 to 130/12; Ind. Code Ann. §§ 5-16-7-1 to 5-16-7-5; Kan. Stat. Ann. § 68-2317 [for highway contracts]; Ky. Rev. Stat. Ann. §§ 337.505 to 337.550; Me. Rev. Stat. Ann., tit. 26, §§ 1303 to 1314; Md. Code Ann., State Fin. & Proc. Code, §§ 17-201 to 17-226; Mass. Gen. Laws ch. 149, §§ 26 to 27H; Mich. Comp. Laws §§ 408.551 to 408.558; Minn. Stat. §§ 177.41 to 177.44; Mo. Rev. Stat. §§ 290.210 to 290.340; Mont. Code Ann. §§ 18-2-401 to 18-2-432; Nev. Rev. Stat. §§ 338.020 to 338.095; N.J. Stat. Ann. §§ 34:11-56.25 to 34:11-56.47; N.M. Stat. Ann. §§ 13-4-10.1 to 13-4-17; N.Y. Labor Law § 220(3)(a); Ohio Rev. Code Ann. §§ 4115.03 to 4115.16; Or. Rev. Stat. §§ 279C.800 to 279C.870; 43 Pa. Cons. Stat. §§ 165-1 to 165-17; R.I. Gen. Laws §§ 37-13-1 to 37-13-17; Tenn. Code Ann. §§ 12-4-401 to 12-4-415; Tex. Gov. Code Ann. §§ 2258.001 to 2258.058; Vt. Stat. Ann., tit. 29, § 161 [for state construction projects]; Wn. Rev. Code. §§ 39.12.010 to 39.12.900; W.Va. Code §§ 21-5A-1 to 21-5A-11; Wis. Stat. § 66.0903; Wyo. Stat. Ann. §§ 27-4-401 to 27-4-413; see also Guam Code Ann., tit. 5, ch. 50, § 50105.)

[5] See the Davis-Bacon Act (46 Stat. 1494, codified at 40 U.S.C. §§ 3141-3148); *U. S. v. Binghamton Construction Co.* (1954) 347 U.S. 171, 176-177.

[6] See Los Angeles Administrative Code, division 10, chapter 1, article 1, section 10.7.1 (requiring payment of the prevailing wage in all city contracts); *id*.,

(*footnote continued on next page*)

17

the prevailing wage in the region to construction workers who toil on publicly funded construction projects. Allowing charter cities[7] to opt out of the constraints of that state law—not for any reason touching on municipal governance or independence, but simply to save the city money—seriously undermines the goals of the prevailing wage law and is contrary to the explicit intent of the Legislature.[8] Even were the issue close, which it is not, applicable precedent requires this court

---

(*footnote continued from previous page*)

section 10.7 (specifically waiving the city's rights under the municipal affairs doctrine); see also San Francisco Administrative Code, chapter 6, article II, section 6.22(E) ("All contractors and subcontractors performing a public work or improvement for the City and County of San Francisco shall pay its workers on such projects the prevailing rate of wages . . .").

[7] There are 120 charter cities in the state of California. SBCTC states in its brief that more than half the state's population live in charter cities.

[8] The Legislature recently acted to specify that if a charter city's ordinance prohibits consideration of a project labor agreement (defined by Pub. Contract Code, § 2500, subd. (b)(1) as a "prehire collective bargaining agreement that establishes terms and conditions of employment," including wages) for a public works project, "state funding or financial assistance shall not be used to support that project" (Pub. Contract Code, § 2502). (Both provisions added by Stats. 2011, ch. 431, § 2, enacting Sen. Bill No. 922 (2011-2012 Reg. Sess.).) The history of this legislation notes that the law was deemed necessary because "[s]everal counties (Stanislaus, Orange, and San Diego) and Charter Cities (Chula Vista and Oceanside) have banned [project labor agreements]." (Assem. Com. on Business, Professions and Consumer Protection, Rep. on Sen. Bill No. 922 (2011-2012 Reg. Sess.) as amended Sept. 2, 2011, p. 3.)

Just this year, the Legislature returned to the subject and highlighted its commitment to give localities the option of using project labor agreements. Section 2503, added to the Public Contract Code, provides that if a charter city's ordinance "prohibits, limits, or constrains in any way the governing board's authority or discretion to adopt, require, or utilize a project labor agreement, . . . then state funding or financial assistance shall not be used to support any construction projects awarded by the city." (Stats. 2012, ch. 11, § 1.) Both new laws are not effective until January 15, 2015, to allow cities to repeal ordinances that establish blanket bans on project labor agreements.

18

to err on the side of upholding state power.  "There must always be doubt whether a matter which is of concern to both municipalities and the state is of sufficient statewide concern to justify a new legislative intrusion into an area traditionally regarded as 'strictly a municipal affair.'  Such doubt, however, 'must be resolved in favor of the legislative authority of the state.' "  (*Baggett v. Gates*, *supra*, 32 Cal.3d at p. 140, quoted with approval in *California Fed. Savings*, *supra*, 54 Cal.3d at p. 24.)

Because the majority mistakenly characterizes Vista's interest in saving money on its construction projects as falling within the municipal affairs doctrine, and concomitantly fails to accord sufficient weight to the obvious statewide economic interests served by the prevailing wage law, I dissent.

**WERDEGAR, J.**

**I CONCUR:**

**LIU, J.**

19

**DISSENTING OPINION BY LIU, J.**

I join Justice Werdegar's dissent. I write separately to highlight additional shortcomings in the court's analysis that prevent it from properly resolving this case.

The court holds that article XI, section 5 of the California Constitution, the municipal home rule provision, bars the Legislature from requiring charter cities to pay prevailing wages to construction workers on public works projects. While generally stating the applicable law correctly, the court fails to bridge the wide analytical gap between that law and the result it reaches. The court employs a vague analysis that puts great weight on a few factors while refusing to consider other factors that the opinion itself concedes are pertinent to determining whether the prevailing wage law should apply to charter cities. As a result, no clear legal principle emerges from the court's opinion, even as it repeatedly insists that the issue before us is a question of law.

Today's decision is a misstep as a matter of method as well as result. Unlike cases where a state law limits a municipal prerogative specifically protected by constitutional text, the instant dispute is one "with no unmistakable signs to guide us between the domain of state and local powers." (*Ex parte Daniels* (1920) 183 Cal. 636, 640.) Accordingly, our instinct toward judicial restraint should be at its peak. The court, however, casts restraint aside and arbitrarily curtails the Legislature's power. Because the court moves incautiously in an area where "it becomes us to exercise more than the usual caution" (*ibid.*), I respectfully dissent.

## I.

Article XI, section 5, subdivision (a) of the California Constitution provides: "It shall be competent in any city charter to provide that the city governed thereunder may make and

1

enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws.  City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith."  Subdivision (b) further provides:  "It shall be competent in all city charters to provide, in addition to those provisions allowable by this Constitution, and by the laws of the State for:  (1) the constitution, regulation, and government of the city police force[,] (2) subgovernment in all or part of a city[,] (3) conduct of city elections[,] and (4) *plenary authority is hereby granted*, subject only to the restrictions of this article, to provide therein or by amendment thereto, the manner in which, the method by which, the times at which, and the terms for which the several municipal officers and *employees* whose compensation is paid by the city shall be elected or appointed, and for their removal, and *for their compensation,* and for the number of deputies, clerks and other employees that each shall have, and for the compensation, method of appointment, qualifications, tenure of office and removal of such deputies, clerks and other employees."  (Italics added.)

As the court correctly states, under this article "the ordinances of charter cities supersede state law with respect to 'municipal affairs' . . . but state law is supreme with respect to matters of 'statewide concern.' "  (Maj. opn., *ante*, at p. 1.)  Determining what constitutes a "municipal affair" or a "matter of statewide concern" in the course of resolving conflicts between state mandates and municipal prerogatives has not been an easy task.  Nevertheless, several important principles have emerged from our cases.

First, when we have considered California Constitution article XI, section 5 and similar constitutional home rule provisions for counties and for the University of California, we have been most protective of home rule prerogatives explicitly recognized in the text of our Constitution.  Most prominently, we have limited or invalidated state laws that unduly interfere with the prerogative of local governments to set the salaries of their own employees.  (See *County of Riverside v. Superior Court* (2003) 30 Cal.4th 278; *San Francisco Labor Council v. Regents of the University of California* (1980) 26 Cal.3d 785;

2

*Sonoma County Organization of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296 (*County of Sonoma*).)

Second, in determining whether a state statute may be applied to a charter city, we have examined the "extramural" or "extramunicipal" dimension of the statute — that is, the reach of the statute beyond merely controlling local matters. (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1, 17, 23-24 (*CalFed*).) A strong extramunicipal dimension supports the conclusion that the statute may be imposed on charter cities. (See *ibid*.; *Baggett v. Gates* (1982) 32 Cal.3d 128, 138-140; Pac. *Tel. & Tel. Co. v. City & County of San Francisco* (1959) 51 Cal.2d 766, 775-776 (*Pacific Telephone*).) In making this determination, we have examined not simply the statute's stated goals, but also whether the statute is reasonably related to those goals. (*Johnson v. Bradley* (1992) 4 Cal.4th 389, 410.) Statutes that seek to micromanage municipal affairs without any clear extramunicipal objective have been held inapplicable to charter cities. (See, e.g., *County of Sonoma*, *supra*, 23 Cal.3d at pp. 317-318 [finding no extramunicipal statewide concern to justify a state law restricting state funds to cities that grant cost-of-living increases to their employees].)

Third, courts will also assess the degree to which a state law actually intrudes into municipal prerogatives. The fact that a state law constrains local decisionmaking, even in traditional areas of home rule, does not by itself establish a sufficient degree of intrusion to render the state law inapplicable to charter cities. Thus, for example, we have held that state law may govern numerous aspects of employment relations where the state law allows local governments the ultimate say in managing and compensating their employees. (See *People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach* (1984) 36 Cal.3d 591, 600 (*Seal Beach*) ["[I]n an unbroken series of public employee cases, . . . it has been held that a 'general law prevails over local enactments of a chartered city, even in regard to matters which would otherwise be deemed to be strictly municipal affairs, where the subject matter of the general law is of statewide concern.' [Citation.]"]; *id.* at p. 601 [statutory duty to meet and confer with employees over changes in conditions of employment applies to charter

3

cities]; *Baggett v. Gates*, *supra*, 32 Cal.3d at p. 140 [Public Safety Officers' Procedural Bill of Rights applies to charter cities]; *International Assn. of Fire Fighters v. City of Palo Alto* (1963) 60 Cal.2d 276, 294-295 [statutory right of firefighters to join unions applies to charter cities].)

Fourth, in considering what constitutes a municipal affair or statewide concern, "courts should avoid the error of 'compartmentalization,' that is, of cordoning off an entire area of governmental activity as either a 'municipal affair' or one of statewide concern." (*CalFed*, *supra*, 54 Cal.3d at p. 17.) The reason courts should avoid such compartmentalization is that " 'the constitutional concept of municipal affairs is not a fixed or static quantity . . . [but one that] changes with the changing conditions upon which it is to operate.' " (*Id.* at pp. 17-18, quoting *Pacific Telephone*, *supra*, 51 Cal.2d at p. 771.) This principle has operated with particular force when the case involves asserted home rule prerogatives not explicitly protected by the text of Constitution article XI, section 5. (See *CalFed*, *supra*, 54 Cal.3d at pp. 17-18 [upholding state law displacing municipal tax on savings banks]; *Pacific Telephone*, *supra*, 51 Cal.2d at p. 766 [upholding state law displacing municipal control of construction and maintenance of telephone lines].)

A corollary of this fourth principle is that in order to determine the shifting boundaries between state and municipal legislative power, courts will engage in a factual inquiry to understand the nature of historical changes relevant to the determination. In some cases, the evidence considered will be general, judicially noticeable facts. (See, e.g., *Pacific Telephone*, *supra*, 51 Cal.2d at p. 776 [relying on "a vast change in conditions" related to telephone service over the previous 50 years to conclude that placing telephone lines in city streets "is not at the present time a municipal affair but is a matter of statewide concern"].) In other cases, the factual inquiry has involved an examination of legislative findings and evidence in the trial record. (See *CalFed*, *supra*, 54 Cal.3d at pp. 21-24 & fn. 21 [engaging in extensive analysis of legislative and trial court findings to conclude that a statute eliminating the power of local entities to tax savings banks applies to charter cities].) As *CalFed* explained: "When a court invalidates a charter city measure in favor of a conflicting

4

state statute, the result does not necessarily rest on the conclusion that the subject matter of the former is not appropriate for municipal regulation. It means, rather, that under the historical circumstances presented, the state has a more substantial interest in the subject than the charter city." (*Id.* at p. 18.) At the same time, "a decision favoring a charter city measure [does not] preclude superseding state legislation in a later case if the fact-bound justification — the statewide dimension — is subsequently demonstrated." (*Ibid.*) "[T]he hinge of the decision," *CalFed* said, "is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on *sensible, pragmatic considerations*." (*Ibid.*, italics added.)

Finally, and critically, we have long held that "[w]hen there is a doubt as to whether an attempted regulation relates to a municipal or to a state matter, or if it be the mixed concern of both, the doubt must be resolved in favor of the legislative authority of the state." (*Abbott v. City of Los Angeles* (1960) 53 Cal.2d 674, 681; see *CalFed*, *supra*, 54 Cal.3d at p. 24; *Baggett v. Gates*, *supra*, 32 Cal.3d at p. 140.) The basis for this rule was articulated long ago in *Ex parte Daniels*, *supra*, 183 Cal. at p. 640: " 'with no unmistakable signs to guide us between the domain of state and local powers, it becomes us to exercise more than the usual caution not to refuse the sanction of judicial authority to legislation which is supposed to have exceeded a boundary so difficult to locate and define.' " This principle is a variant of the general proposition, rooted in the separation of powers, that " ' "[i]f there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [*imposed by the Constitution*] are to be construed strictly . . . ." ' " (*Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180, bracketed language and italics in *Pacific Legal Foundation*.)

With these principles in mind, let us now examine today's opinion.

## II.

The court ignores or misapplies the principles above in conducting its analysis. First and foremost, the court discounts as irrelevant the record evidence demonstrating

the state's extramunicipal interest in supporting construction labor markets and apprenticeship programs. Although the Court of Appeal below concluded that the evidentiary record and legislative findings were insufficient to establish that the prevailing wage law significantly furthered the state's interests, the court rejects this approach. It proceeds instead on the theory that the facts demonstrating the state's interest merit little or no consideration because the issue before us is a question of law. "Factual findings by the Legislature or the trial court . . . are not controlling. [Citation.] The decision as to what areas of governance are municipal concerns and what are statewide concerns is ultimately a legal one." (Maj. opn., *ante*, at p. 10.)

But the court jousts with a strawman. No one suggests that factual findings by the Legislature or trial court should be "controlling." The important point, amply supported by our precedents (see *ante*, at pp. 4-5), is that such findings are *relevant* to the inquiry. The court actually acknowledges this point, as it must, when it says "[o]f course, the inquiry is not wholly removed from historical, and hence factual, realities" (maj. opn., *ante*, at p. 9) and then recites the above quoted guidance from *CalFed*, *supra*, 54 Cal.3d at pages 17-18, emphasizing the factual and historical nature of the inquiry. This recitation turns out to be an empty gesture, however, for one searches in vain for any discernible application of *CalFed*'s guidance in the court's analysis of the prevailing wage law. Simply put, there is none.

That is not to say that the historical and factual justifications for the prevailing wage law go unmentioned in today's opinion. The court devotes four detailed paragraphs to describing a declaration submitted by an expert for plaintiff State Building and Construction Trades Council of California, AFL-CIO. (Maj. opn., *ante*, at pp. 13-15.) As the court says, the declaration explains the prevailing wage law's beneficial effects on construction labor markets, the increasing regionalization of those labor markets as workers travel long distances to a jobsite, the fact that wages are generally set regionally rather than locally, and the importance of the prevailing wage law in supporting apprenticeship programs that train the next generation of skilled workers. (*Ibid.*)

6

After reading this lengthy and quite plausible explanation of why the Legislature enacted the prevailing wage law, one might expect some analysis that examines how much weight the historical and factual underpinnings of the law should have in determining whether it addresses a matter of statewide concern.  One might expect some explanation, in light of the court's holding, of why the record falls short of identifying "a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations." (*CalFed*, *supra*, 54 Cal.3d at p. 18.)  But rather than assess the record evidence, the court simply waves it away and changes the subject:  "Certainly regional labor standards and the proper training of construction workers are statewide concerns *when considered in the abstract*.  But the question presented here is not whether the state government has an abstract interest in labor conditions and vocational training.  Rather, the question presented is whether the state can require a charter city to exercise its purchasing power in the construction market in a way that supports regional wages and subsidizes vocational training, while increasing the charter city's costs.  No one would doubt that the state could use *its own* resources to support wages and vocational training in the state's construction industry, but can the state achieve these ends by interfering in the fiscal policies of charter cities?  ' "[W]e can think of nothing that is of greater municipal concern than how a city's tax dollars will be spent; nor anything which could be of less interest to taxpayers of other jurisdictions." ' (*Johnson v. Bradley*, *supra*, 4 Cal.4th at p. 407.)  Therefore, the Union here cannot justify state regulation of the spending practices of charter cities merely by identifying some indirect effect on the regional and state economies." (Maj. opn., *ante*, at p. 15, original italics.)

This passage merits several comments.  To begin with, in labeling the state's interest "abstract," the court does nothing more than employ a rhetorical device to diminish the importance of that interest.  The court does not explain in what sense the state's interest in supporting regional labor markets and apprenticeship programs designed to maintain a highly skilled, well-paid construction workforce throughout California is "abstract."  Surely

7

the court is not faulting the Legislature, the representative body for our entire state, for legislating on the basis of labor market trends, public policy goals, and laws of supply and demand that have not been particularized to, say, the City of Vista or San Diego County. If the court is instead using "abstract" to mean that the Legislature has not sufficiently demonstrated that the prevailing wage law will truly benefit regional labor markets and support apprenticeship programs, then one would expect the court to hold, with the Court of Appeal, that there was insufficient evidence in the record to establish the law's efficacy. But the court rejects that position, so the sufficiency of the evidence cannot really be the court's concern.

If the court uses the term "abstract" to mean that the present inquiry requires us to consider the statewide concern not in isolation but in relation to the asserted municipal interests, then I agree. But if we are to assess the relative strengths of the state and local interests, then why should we not look to evidence bearing on the respective strengths of those interests? That is precisely the kind of evidence we examined in *CalFed* to determine that the state acted constitutionally in eliminating what had formerly been a local prerogative. (*CalFed*, *supra*, 54 Cal.3d at pp. 21-24 & fn. 21.) It is also the kind of evidence pertinent to assessing whether the extramunicipal dimension of the state law at issue is robust or trivial. (See *ante*, at p. 3.) Yet the court simply dismisses the state interest as "abstract" without any meaningful evaluation of its factual and historical underpinnings.

The court instead focuses on the fact that the state seeks to regulate a charter city's purchasing power in a manner that "increas[es] the charter city's costs." (Maj. opn., *ante*, at p. 15.) But it is hardly clear that a charter city's interest in how its tax dollars are spent is any less abstract for present purposes than the state's interest in its legitimate policy goals. Our precedents unambiguously indicate that a charter city's general interest in controlling its tax dollars is not by itself sufficient to render inapplicable a state law that addresses a statewide concern. In *Seal Beach*, *supra*, 36 Cal.3d 591, for example, we held that the "meet and confer" requirement of the Meyers-Milias-Brown Act (MMBA; Gov. Code § 3500 et seq.) did not conflict with the prerogatives of a charter city to propose charter amendments

8

affecting employment relations. As a sheer matter of dollars and cents, the marginal cost to cities of administering the MMBA, which requires city management to negotiate to impasse with its employees regarding compensation and other employment terms, is probably at least as great as requiring cities to pay a prevailing wage when they contract out for public works. The statutory protections to assure fair labor practices in police departments and fire departments that we upheld against home rule challenges in *Baggett v. Gates*, *supra*, 32 Cal.3d 128, and *International Assn. of Fire Fighters v. City of Palo Alto*, *supra*, 60 Cal.2d 276, respectively, likewise imposed substantial monetary costs on the affected municipalities. Indeed, almost every state regulation, including laws specifically directed at government entities, impacts the way a city spends its money and other resources. In addition to labor and employment laws, environmental laws like the California Environmental Quality Act require the expenditure of substantial municipal resources to enforce. Unless the court intends to invite home rule challenges to a very broad swath of state laws, the fact that a state law increases a charter city's costs or otherwise constrains what a city can do with its money cannot be the determinative factor, or even the primary factor, in the present analysis.

While forcefully invoking the city's fiscal interests (see maj. opn., *ante*, at p. 15 ["Autonomy with regard to the expenditure of public funds lies at the heart of what it means to be an independent governmental entity."]), the court does not acknowledge, much less grapple with, the readily apparent limitations on this rationale for immunizing a charter city from an otherwise applicable state law. Instead, the court opts for an undiscriminating, categorical approach that holds the prevailing wage law inapplicable to charter cities, no matter how strong the state's interest or how slight the intrusion into the charter city's treasury. Notably, the City of Vista has not put forward any evidence indicating how much, if at all, the prevailing wage law would increase the city's costs for the public works projects at issue. One might wonder, on the principle that you get what you pay for, whether the higher wages required by the prevailing wage law are at least partially offset by the higher productivity of better paid, better skilled workers. (See Mahalia, Prevailing Wages in

9

Government Contract Costs: A Review of the Research (2008) p. 2.)  Because the court's reasoning does not depend on any facts as to how much the prevailing wage law will actually increase the city's costs, presumably even an increase of one dollar must be held to invade the "heart" of the city's autonomy.  (Maj. opn., *ante*, at p. 15.)

The extremity of such a conclusion is a symptom of additional problems with the court's categorical approach.  The majority relies on precedent, chiefly this court's 80-year-old decision in *Pasadena v. Charleville* (1932) 215 Cal. 384, 389 (*Charleville*).  (Maj. opn., *ante*, at p. 13.)  But, as Justice Werdegar points out, *Charleville*'s reasoning that the prevailing wage law does not address a matter of statewide concern is based largely on a thoroughly discredited conception of constitutional limitations on economic legislation.  (See dis. opn. of Werdegar, J., *ante*, at pp. 6-7.)  I would add that the *Charleville* court's notion of a state law that *does* address a matter of statewide concern — the Public Works Alien Employment Act, which barred aliens from being employed on public works projects (see *Charleville*, at pp. 399-400 [analogizing the statute to California's Alien Land Law, which prohibited the sale of agricultural land to aliens]) — has been equally discredited.  (See *Oyama v. California* (1948) 332 U.S. 633 [invalidating California's Alien Land Law under the equal protection clause]; see also *Graham v. Richardson* (1971) 403 U.S. 365, 372 [state classifications based on alienage are "inherently suspect and subject to close judicial scrutiny"].)

It is beyond dispute that construction labor markets have become increasingly regional since *Charleville* was decided.  (Maj. opn., *ante*, at p. 14; dis. opn. of Werdegar, J., *ante*, at pp. 12-13.)  Given that fact as well as obvious and important changes in the legal landscape since 1932, it is mystifying that the court does not flinch in continuing to follow a *Lochner*-era precedent built on *Lochner*-era premises.  (*Lochner v. New York* (1905) 198 U.S. 45.)  But more than mystifying, the court's ready adherence to *Charleville* is indefensible under the very precedents that the court elsewhere recites and even italicizes.  If *Charleville*'s holding is not worthy of reconsideration, then what is left of the precept that " ' "*the constitutional concept of municipal affairs is not a fixed or static quantity . . . [but*

10

*one that*] *changes with the changing conditions upon which it is to operate*" ' "?  (Maj. opn., *ante*, at p. 9, quoting *CalFed*, *supra*, 54 Cal.3d at pp. 17-18, quoting *Pacific Telephone*, *supra*, 51 Cal.2d at p. 771, italics added by the court.)  The court commits the very "error of 'compartmentalization' " that *CalFed* warned against by "cordoning off" the wages paid by local public works contractors as a "municipal affair."  (*CalFed*, at p. 17.)  If there is room in today's opinion for a superseding prevailing wage law to survive home rule challenge "in a later case" based on a future "fact-bound justification" (*id.* at p. 18), I fail to see it — and the court does not (because it cannot) say there is.

Even without *CalFed*'s specific instruction to analyze the constitutional concept of municipal affairs on the basis of changing historical circumstances, there is ample reason to reconsider *Charleville* under the doctrine of stare decisis.  That doctrine authorizes a court to revisit precedent when "related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine [citation]" and when "facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification [citation]."  (*Planned Parenthood v. Casey* (1992) 505 U.S. 833, 855 (plur. opn. by O'Connor, J.); see *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 297 [overturning a nine-year-old precedent on the ground that "reexamination of precedent may become necessary when subsequent developments indicate an earlier decision was unsound, or has become ripe for reconsideration"].)  *Charleville* easily satisfies these criteria.

In addition to relying on questionable precedent, the court reaches its categorical holding by denying any relevant distinction between a charter city's interest in controlling the wages of its own employees and its interest in controlling the wages of employees of private contractors building public works:  "If, as the Union contends, the prevailing wage law's shift from a purely local focus to a regional focus has made the wage levels of workers constructing locally funded public works a matter of statewide concern, then that would be true whether the case involved public employees or private employees."  (Maj. opn., *ante*, at pp. 18-19.)  This statement is the predicate for the court's reliance on our cases holding that

11

the Legislature may not directly dictate the compensation of charter city employees. (*Id.* at pp. 16-18, discussing *County of Riverside v. Superior Court*, *supra*, 30 Cal.4th 278; *San Francisco Labor Council v. Regents of the University of California*, *supra*, 26 Cal.3d 785; *County of Sonoma*, *supra*, 23 Cal.3d 296.)

But the court's position ignores key differences in the nature of the local interest involved. Most importantly, municipal control of employee compensation, unlike control of the wages of contract employees, is explicitly protected by the text of article XI, section 5, subdivision (b) of the California Constitution and similar constitutional home rule provisions. (See *ante*, at p. 2.) Moreover, as a practical matter, the two types of control are not comparable. Employee salaries make up the vast majority of a municipality's budget. In Los Angeles, for example, employee salaries comprise 85 percent of the budgets of city departments. (See Los Angeles Mayor Antonio Villaraigosa, Mayor's Office Web page, Balanced Budget, Frequently Asked Questions, <http://mayor.lacity.org/Issues/BalancedBudget/FrequentlyAskedQuestions/ index.htm> [as of July 2, 2012].) Interference with employee salaries would thus have an enormous, ongoing impact on city finances. And if the state sought to control the salaries of only some city employees, such control would interfere with the city's ability to set salary schedules and pay differentials for its employees, decisions which in turn affect matters of employee morale, retention, and workforce cohesion that indeed go to the heart of municipal autonomy. Interference with employee salaries would also likely affect a municipality's long-term pension obligations. None of these concerns is implicated when the state sets a floor for the wages of employees of a company with which a city temporarily does business to construct a public work. This is not a case about whether a state law can control employee salaries; it is about whether a state law can raise the cost of a municipal public work in order to further otherwise legitimate policy goals.

The court relies on two other factors to support its holding. First, it contends that "a state law of broad general application is more likely to address a statewide concern than one that is narrow and particularized in its application." (Maj. opn., *ante*, at p. 19.)

12

"[T]he state law at issue is not a minimum wage law of broad general application; rather, the law at issue here has a far narrower application, as it pertains only to the public works projects of public agencies." (*Id.* at p. 20.)  This lack of general application "further undermine[s] the Union's assertion that the matter here presents a statewide concern and therefore requires Vista, a charter city, to comply with the state's prevailing wage law on the city's locally funded public works projects." (*Ibid.*)

I agree that the general applicability of a state law to public as well as private entities supports the conclusion that the law has an important extramunicipal dimension.  However, as a matter of fact and logic, there is no reason to suppose that a state law's lack of general applicability means it does not have a significant extramunicipal dimension.  The court asserts that, in contrast to a minimum wage law, "the law at issue here has a far narrower application, as it pertains *only* to the public works projects of public agencies." (Maj. opn., *ante*, at p. 20, italics added.)  Yet public works projects are a multibillion dollar annual enterprise in California, and charter cities, which contain over half the state's population (see dis opn. of Werdegar, J., *ante*, at p. 18, fn. 7), no doubt account for a substantial share of those dollars.  Instead of regulating this vast enterprise by imposing statewide minimum wages for construction workers through general legislation applicable to private and public entities, the Legislature has chosen to influence such wages through the market-based approach of directing the purchasing power of public entities to support union-level wages.  Instead of indicating that the prevailing wage law is not a matter of statewide concern, the application of the law only to public entities plausibly represents a legislative judgment that direct regulation of private labor markets is not necessary to accomplish the statute's goals given the substantial role that public works projects play in influencing private sector construction workers' wages and in supporting apprenticeship programs.  As the court acknowledges, prevailing wage laws have long been in use, in California and throughout the country, to accomplish these goals. (Maj. opn., *ante*, at pp. 5-6; see also dis opn. of Werdegar, J., *ante*, at pp. 17-18, fns. 5, 6.)  What basis is there for insisting that only more

13

intrusive state laws that regulate both private and public sectors may be applied to charter cities?

The other factor on which the court relies is that "state laws at issue set forth generally applicable *procedural* standards, and consequently impinged less on local autonomy than if they had imposed substantive obligations." (Maj. opn., *ante*, at p. 19.) It is true that our decision in *Seal Beach*, upholding the MMBA's "meet and confer" requirement, observed that the city council "retains the ultimate power to refuse an agreement and to make its own decision." (*Seal Beach*, *supra*, 36 Cal.3d at p. 601.) In a footnote, "[w]e emphasize[d] that there is a clear distinction between the *substance* of a public employee labor issue and the *procedure* by which it is resolved." (*Id.* at p. 600, fn. 11, original italics.) But this factor is not dispositive. *Seal Beach* may be read to say that procedural laws will generally survive a home rule challenge, not that substantive laws generally won't. Both *CalFed*, *supra*, 54 Cal.3d 1, which came after *Seal Beach*, and *Pacific Telephone*, *supra*, 51 Cal.2d 766, which remains good law, upheld state statutes that foreclosed municipalities from making substantive decisions in important areas of local concern. The substantive nature of the prevailing wage law is one factor to be considered together with all the others discussed above.

### III.

Perhaps the most serious error in the court's analysis is its disregard for the principle that doubts about whether a law is a matter of statewide concern must be resolved in favor of the legislative authority of the state. (*Abbott v. City of Los Angeles*, *supra*, 53 Cal.2d at p. 681; *Ex parte Daniels*, *supra*, 183 Cal. at p. 640.) Although the present dispute involves a contest between two levels of democratic decisionmaking — local and state — one should not think that democracy (of some kind) will be the winner no matter how we rule. If we were to uphold the prevailing wage law, charter cities could still bring their complaints to the Legislature through the ordinary political process, and it seems at least plausible that state legislators would be attentive to the concerns of local officials on whom they often depend for political support. However, having declared the prevailing wage law unconstitutional as

14

applied to charter cities, the court has placed the issue beyond the ordinary political process. As Justice Werdegar notes, this court's decisions on the meaning of the California Constitution can be corrected only by a constitutional amendment. (Dis. opn. of Werdegar, J., *ante*, at p. 1.) It is hard to believe that in this case, where the text of our Constitution provides no clear answer, the correct outcome is so utterly free of doubt that our usual instinct toward judicial restraint may be abandoned.

In fairness, there is no reason to expect that any single factor will properly resolve the case before us. The factors that the court does consider — the possible costs to the city, the law's lack of general applicability, the law's substantive as opposed to procedural character — may validly be used to assess the state's and the city's relative interests. But the court refuses to undertake a factual or historical inquiry to determine the relative strengths of the state and municipal interests, even though that is what our precedents instruct. The court refuses to reconsider *Charleville*, *supra*, 215 Cal. 384, even though its legal and factual underpinnings have been thoroughly eroded over eight decades. The court refuses to see any distinction between municipal control of its own employees' wages and municipal control of the wages of a contractor's employees, even though the former is more likely to disrupt local autonomy and, unlike the latter, is explicitly protected by the text of our Constitution.

I have no objection to an all-things-considered approach to the present inquiry because it is probably the best we can do. But such an approach (1) must truly consider *all* relevant aspects of the inquiry, not just an arbitrary few; (2) should lead us to reach fairly limited holdings instead of categorical pronouncements; and (3) should cause us "to exercise more than the usual caution" before invalidating the work of a co-equal, politically representative branch of government (*Ex parte Daniels*, *supra*, 183 Cal. at p. 640). Today's decision violates all three precepts in arriving at a fixed conception of municipal autonomy that is neither rooted in the language of our Constitution nor consistent with current realities.

As Justice Werdegar explains (dis. opn. of Werdegar, J., *ante*, at pp. 11-15), the record evidence indicates that the prevailing wage law is a reasonable means of supporting regional construction labor markets and apprenticeship programs. There is no question that

15

the law interferes with municipal autonomy.  But the law does not invade any local prerogative expressly protected by constitutional text.  And it is not clear that the law's interference with municipal autonomy is excessive in relation to the legitimate public purposes that the Legislature aims to achieve.  There is, in this case, "a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations."  (*CalFed*, *supra*, 54 Cal.3d at p. 18.)  But even if there were some doubt, judicial restraint should prevail.

     I respectfully dissent.

LIU, J.

I CONCUR:

WERDEGAR, J.

16

**Name of Opinion** State Building & Construction Trades Council of California v. City of Vista

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 173 Cal.app.4th 567
**Rehearing Granted**

_____

**Opinion No.** S173586
**Date Filed:** July 2, 2012

_____

**Court:** Superior
**County:** San Diego
**Judge:** Robert P. Dahlquist

_____

**Counsel:**

Altshuler Berzon, Stephen P. Berzon, Scott A. Kronland and Peter E. Leckman for Plaintiff and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, James M. Humes, Chief Deputy Attorney General, Gordon B. Burns, Deputy State Solicitor General, Christopher E. Krueger and Jonathan K. Renner, Assistant Attorneys General, Douglas J. Woods and Peter M. Williams, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiff and Appellant.

Davis, Cowell & Bowe, John J. Davis, Jr., and Andrew J. Kahn for Northern California Mechanical Contractors Association, Los Angeles Chapter of the National Electrical Contractors Association, Air Conditioning, Refrigeration and Mechanical Contractors Association of Southern California, California Plumbing and Mechanical Contractors Association, California Sheet Metal Air Conditioning Contractors National Association, Associated Plumbing and Mechanical Contractors Association and Mechanical Contractors Council of Central California as Amici Curiae on behalf of Plaintiff and Appellant.

Law Offices of Carroll & Scully, Donald C. Carroll and Charles P. Scully II for Southern California Labor Management Operating Engineers Contract Compliance Committee as Amicus Curiae on behalf of Plaintiff and Appellant.

Law Office of Lawrence H. Kay and Lawrence H. Kay for Construction Employers' Association's as Amicus Curiae on behalf of Plaintiff and Appellant.

Weinberg, Roger & Rosenfeld, Sandra Rae Benson, Patricia M. Gates, Roberta D. Perkins and Sharon Seidenstein for Northern California Basic Crafts Alliance, California Apprenticeship Coordinators Association, Jeff Armstrong, Tammy Castillo, Sumaria Love, John Bullock and Mavis McAllister as Amici Curiae on behalf of Plaintiff and Appellant.

Darold D. Pieper, City Attorney, Jonathan B. Stone, Deputy City Attorney; McDougal, Love, Eckis, Smith, Boehmer & Foley, Lounsbery, Ferguson Altona & Peak, James P. Lough, David M. Stotland; Richards Watson & Gerson and T. Peter Pierce for Defendants and Respondents.

Atkinson, Andelson, Loya, Ruud & Romo, Robert Fried, Elizabeth P. Lind and W. Bryce Chastain for Associated Builders & Contractors of California as Amicus Curiae on behalf of Defendants and Respondents.

Patrick Whitnell and Kourtney Burdick for League of California Cities as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Scott A. Kronland
Altshuler Berzon
177 Post Street, Suite 200
San Francisco, CA  94108
(415) 421-7151

Douglas J. Woods
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 323-8405

James P. Lough
Lounsbery, Ferguson Altona & Peak
960 Canterbury Place, Suite 300
Escondido, CA  92025
(760) 743-1201